PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 11-1447
———

RIDLEY SCHOOL DISTRICT

v.

M.R.; J.R., PARENTS OF MINOR CHILD E.R.

v.

JANET CENNAME


M.R.; J.R. Parents of Minor Child E.R.,

Appellants
———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-09-cv-02503)
District Judge:  Honorable Mitchell S. Goldberg
———

Argued March 19, 2012
Before:  RENDELL, FISHER and

CHAGARES, *Circuit Judges*.

(Filed: May 17, 2012)

Alan L. Yatvin (Argued)
Popper & Yatvin
230 South Broad Street, Suite 503
Philadelphia, PA 19102
        *Counsel for Appellants*

Jennifer C. Lowman (Argued)
Leonard Rieser
Education Law Center
1315 Walnut Street, Suite 400
Philadelphia, PA 19107
        *Counsel for Amicus Appellants,*
        *Learning Disabilities Association*
        *of Pennsylvania and Education*
        *Law Center of Pennsylvania*

John F.X. Reilly (Argued)
Delaware County Office of District Attorney
201 West Front Street
Media, PA 19063
        *Counsel for Appellees*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

M.R. and J.R., the parents of E.R., a minor, appeal from an order of the District Court, granting judgment on the administrative record in favor of Ridley School District. The District Court reversed a decision by a Pennsylvania Due Process Hearing Officer that Ridley School District violated the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. 1400, *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 701, *et seq.* For the reasons set forth below, we will affirm the order of the District Court.

## I. Background

E.R., who is now ten years old, attended kindergarten (2006-2007) and first grade (2007-2008) at Grace Park Elementary School ("Grace Park") in the Ridley School District ("Ridley"). E.R. has been identified as a child with numerous learning disabilities, as well as several health-related problems, including severe food and contact allergies. During the summer between E.R.'s first and second grade years, M.R. and J.R. (collectively, "Parents") determined that the programs being offered by Ridley were inadequate to address E.R.'s unique needs, and thus decided to remove her from Ridley and enroll her at the Benchmark School, a private school that specializes in instructing students with learning disabilities. Parents subsequently filed a complaint with the Pennsylvania Department of Education, seeking compensatory education for violations of the IDEA and § 504 of the Rehabilitation Act, and tuition reimbursement, including transportation expenses, for E.R.'s enrollment in the Benchmark School. A Due Process Hearing Officer

3

awarded Parents compensatory education for the 2007-2008 school year, as well as reimbursement of tuition for the 2008-2009 school year, and reimbursement for transportation to and from the Benchmark School. The District Court reversed, finding that Parents were entitled to neither compensatory education nor reimbursement for tuition or transportation expenses.

### A. Factual Background

Before E.R. began kindergarten, Parents were concerned about her ability to grasp pre-academic skills, such as letters and numbers, and took her to be evaluated at the Chester County Intermediate Unit ("CCIU"). Although the testing noted some academic difficulties, the evaluators concluded that E.R. did not qualify as a child with special needs. However, in September 2006, shortly after E.R. began kindergarten, she was identified as needing extra academic support, and was placed in extended-day kindergarten ("EDK"). Parents were notified of this placement, and were advised that it was intended to improve E.R.'s math skills and reinforce her kindergarten skills generally.

In November 2006, due to E.R.'s academic struggles and attention problems, Parents requested that Ridley perform an educational evaluation. Ridley agreed, and an Initial Evaluation Report was completed on January 31, 2007. Although the report indicated that math was difficult for E.R., consistent with CCIU's earlier determination, Ridley concluded that she did not qualify for special education services because her cognitive ability and academic achievement levels were both in the average range. Ridley

also conducted an occupational therapy ("OT") evaluation, which was completed on January 24, 2007. The OT findings, which were based largely on the input of teachers, identified the following areas of concern: below grade level ability in math; lack of concentration; inconsistency in remembering numbers one through ten; problems with peer interaction; poor problem-solving skills and desk posture; and difficulty keeping her place when reading.

On February 7, 2007, Ridley convened a meeting to review the Initial Evaluation Report. In response to concerns raised by Parents at the meeting, Ridley agreed to conduct additional testing using The Children's Memory Scale, Test of Auditory Processing Skills, and The Behavior Rating Inventory of Executive Functioning. The additional testing resulted in two addendums to the Initial Evaluation Report, which stated that E.R.'s academic skills were generally in the average range, but that she demonstrated a relative weakness in retaining and manipulating numbers. Based on this information, the school psychologist concluded that E.R. did not have a specific learning disability. Also in February 2007, a § 504 Service Agreement ("the § 504 Agreement") was issued to provide OT services to E.R., and to address her severe allergies.[1] Under the § 504 Agreement, E.R. was to receive OT services once a week for thirty minutes and consultative services to the home and classroom on a regular

---

[1] "§ 504" refers to § 504 of the Rehabilitation Act, which prohibits discrimination in federally-funded programs, including public schools, on the basis of disability. 29 U.S.C. § 794.

basis. Despite her allergies, E.R. was to be included in as many activities as possible, and Parents were to be contacted before activities involving food so that appropriate alternatives could be provided for E.R.

Pursuant to a recommendation made by E.R.'s kindergarten teacher, Mary Moffatt ("Moffatt"), E.R. was enrolled in the Summer Steps program in the Summer of 2007 to reinforce her academic skills. The Summer Steps teacher reported that E.R. made some academic progress, but that she needed improvement in several areas and had difficulty recognizing numbers and counting.

The first six weeks of first grade were spent reviewing kindergarten materials. During this time, E.R. struggled academically and posted several failing grades. In late September 2007, J.R., E.R.'s mother, wrote to E.R.'s first grade teacher, Janet Cenname ("Cenname"), and requested a meeting to discuss E.R.'s poor grades. Cenname declined the request to meet at that time, telling J.R. that it would be premature to meet so early in the year, and that it would be more appropriate to give E.R. time to develop her skills. Cenname explained that she would be "happy to meet" a few weeks later, in early October, if Parents still had concerns. Parents did not re-contact Cenname, and instead requested a meeting with the school's principal. During that meeting, which was held on November 1, 2007, Parents were informed that E.R. had been placed on a "reading watch list" in mid-October. Following the meeting, E.R. was placed in a reading support group, but according to Parents, she had difficulty catching up with the other students because the program had started two months earlier.

On November 16, 2007, Parents requested a comprehensive reevaluation of E.R. Ridley issued a Permission to Evaluate on November 27, 2007, and the reevaluation was completed on February 26, 2008. The Reevaluation Report found that E.R. had learning disabilities in the areas of reading decoding and comprehension, math computation, reasoning skills, and written language. E.R. was also found to have fine motor delays and a language disability. As part of the Reevaluation Report, Ridley's school psychologist prepared recommendations to be considered by the Individual Education Planning Team ("IEP Team"). Based on those recommendations, Ridley offered two alternative placements for E.R.: (1) the learning support room at her current school, Grace Park, or (2) a self-contained classroom at a different elementary school. Parents observed both programs and determined that neither was appropriate for E.R.

An IEP Team meeting was convened on March 28, 2008 to review a draft Individualized Education Program ("IEP") that had been developed to address E.R.'s educational needs. At Parents' request, Ridley agreed to make revisions to the IEP and submit the revisions to Parents for approval. At the meeting, Ridley's Special Education Director, Kim Woods ("Woods"), suggested a program called *Project Read* as a possible reading aid for E.R. Woods told Parents that she would do some research on the program and follow up with Parents and the IEP Team in a few days. Woods also provided Parents with a printout from *Project Read*'s website, and a review of the program conducted by the Florida Center for Reading Research.

7

A Notice of Recommended Educational Placement ("NOREP") was issued on April 2, 2008, but Parents refused to sign it until all of the agreed-upon revisions had been made. Another IEP Team meeting was held on April 30 to address Parents' continuing concerns regarding the IEP. On May 9, a revised NOREP was issued, and Parents signed it in agreement on May 12. However, Parents remained concerned about Ridley's proposed reading program, and requested that Ridley hire someone to provide instruction using *The Wilson Reading System*. Ridley did not do so.

On May 13, 2008, in accordance with the revised NOREP and addendums to the IEP, E.R. began going to Grace Park's "resource room" every day for one hour of reading assistance in the morning and one hour of math assistance in the afternoon. The resource room reading curriculum consisted of the following instructional programs: *Read Naturally*, *Reading Workshop*, *Writing Workshop*, and *Patricia Cunningham's Systematic Phonics*. The resource room employed a program called *Everyday Math* for math instruction. There were five other students in the resource room, none of whom were first graders. Aimee Hodges ("Hodges"), the resource room teacher, explained that although the students were all provided with the same reading programs, different parts of the programs were used for different students, such that assistance was geared toward each student's individual needs. Hodges also testified that everything done in the resource room was "multi-sensory," which meant that the lessons included visual, oral, and hands-on components. E.R.'s grades in the resource room improved dramatically in a short period of time, but Parents attributed

the improvement to improper resource room assistance, and claimed that E.R. was not displaying similar progress at home. By the time E.R.'s first grade year ended, she had received eighteen days of resource room assistance.

On June 9, 2008, the IEP Team met to update the IEP for the 2008-2009 academic year (second grade). The NOREP from the June IEP Team meeting recommended that E.R. continue to receive one hour per day of math instruction and one hour per day of reading instruction in the resource room. The NOREP indicated that the reading instruction would include a direct reading program, as well as a direct phonemic-based program to address E.R.'s needs in decoding vocabulary, fluency, and comprehension skills. The NOREP provided that Ridley would train its learning support staff on *Project Read* during the summer, and that the program would be "up and running" before the end of September 2008. Ridley also agreed to pay for a summer learning program at the Benchmark School, as well as summer math tutoring three times per week.

Parents researched *Project Read* and determined that it was not appropriate for a student with E.R.'s needs. On August 14, 2008, Parents informed Ridley that E.R. would be enrolling at the Benchmark School for the 2008-2009 school year because it provided the "intensive multi-sensory approach to reading" that they determined E.R. required.

## B. Procedural History

On December 4, 2008, Parents filed a due process complaint with the Pennsylvania Department of Education,

alleging that Ridley violated the IDEA and § 504 of the Rehabilitation Act. Parents claimed that Ridley failed to timely identify E.R. as a child in need of special education services, failed to develop an appropriate IEP, and subjected E.R. to discrimination by failing to comply with the § 504 Agreement.

Hearings were held before a Due Process Hearing Officer on January 29, 2009, February 10, 2009, and March 10, 2009. At the hearings, the Hearing Officer reviewed documentary evidence provided by the parties and heard testimony from E.R.'s mother, Linda Heller, Parents' special education advocate, as well as several teachers and school officials. On April 21, 2009, the Hearing Officer issued a written report, finding that: (1) Ridley had not committed any violations during E.R.'s kindergarten year; (2) Ridley violated the IDEA and the Rehabilitation Act in E.R.'s first grade year; and (3) the IEPs proposed for E.R.'s first and second grade years were inadequate and therefore denied E.R. a "free appropriate public education" ("FAPE") because they "lacked appropriate specially designed instruction in the form of a research based, peer reviewed reading program." The Hearing Officer awarded Parents compensatory education for the 2007-2008 year (first grade), reimbursement of tuition at the Benchmark School for the 2008-2009 year (second grade), and reimbursement of transportation expenses to and from the Benchmark School.

Ridley filed a petition for review in the Pennsylvania Commonwealth Court, and the case was subsequently removed to the U.S. District Court for the Eastern District of Pennsylvania. Parents treated the petition as a complaint and

10

filed an answer and counterclaims, in which they challenged the Hearing Officer's conclusion that no violation occurred during E.R.'s kindergarten year, and asserted additional claims against Ridley and Cenname, whom Parents added as a third party defendant.  On October 9, 2009, Ridley filed a motion for judgment on the administrative record.   On February 14, 2011, the District Court affirmed the Hearing Officer's finding as to E.R.'s kindergarten year, reversed the Hearing Officer's findings as to E.R.'s first and second grade years, and granted Ridley's motion for judgment on the administrative record as to all claims.  *Ridley Sch. Dist. v. M.R.*, No. 09-2503, 2011 WL 499966, at *18 (E.D. Pa. Feb. 14, 2011).  Parents filed a timely notice of appeal.

On appeal, Parents raise four arguments.  First, they contend that the District Court improperly placed the burden of persuasion on them to demonstrate that Ridley violated the IDEA.  Second, they argue that the District Court erred in reversing the Hearing Officer's finding that Ridley denied E.R. a FAPE during first grade by failing to timely identify her as a student in need of special education services.  Third, they maintain that the District Court misinterpreted a provision of the IDEA, and improperly reversed the Hearing Officer's finding that E.R.'s IEP was deficient in that it lacked research-based, peer-reviewed specially designed reading instruction.  Finally, Parents argue that the District Court erred in concluding that Ridley did not violate § 504 of the Rehabilitation Act.

11

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction to review the decision of the state educational agency under 20 U.S.C. § 1415(i)(2), and we have appellate jurisdiction over the order of the District Court under 28 U.S.C. § 1291. When considering a petition for review challenging a state administrative decision under the IDEA, a district court applies "a nontraditional standard of review, sometimes referred to as 'modified de novo' review." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010) (citations omitted). Under this standard, a district court must give "due weight" to the findings of the state hearing officer. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). "Factual findings from the administrative proceedings are to be considered prima facie correct. 'If a reviewing court fails to adhere to them, it is obliged to explain why. The court is not, however, to substitute its own notions of sound educational policy for those of local school authorities.'" *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (quoting *MM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 531 (4th Cir. 2002)). "Within the confines of these standards, a district court is authorized to make findings based on the preponderance of the evidence and grant the relief it deems appropriate." *D.S.*, 602 F.3d at 564 (citations omitted); *see also Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (describing a district court's burden as "unusual" in that it must make its own findings by a preponderance of the evidence, but nevertheless afford "due weight" to the administrative officer's determinations).

We exercise plenary review over the District Court's conclusions of law, *D.S.*, 602 F.3d at 564, and "with respect to the question [of] whether the District Court applied the correct legal standards under the IDEA," *Shore Reg'l*, 381 F.3d at 199 (citation omitted). We review the District Court's findings of fact, including a determination as to the appropriateness of an IEP, under a clearly erroneous standard. *D.S.*, 602 F.3d at 564.

### III. Discussion

### A.    Statutory Framework

The IDEA requires states receiving federal education funding to provide every disabled child with a "free appropriate public education." 20 U.S.C. § 1412(a)(1).[2] A

---

[2] "The term 'free appropriate public education' means special education and related services that--

    (A) have been provided at public expense, under public supervision and direction, and without charge;

    (B) meet the standards of the State educational agency;

    (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188-89. Although a state is not required to maximize the potential of every handicapped child, it must supply an education that provides "significant learning" and "meaningful benefit" to the child. *D.S.*, 602 F.3d at 556 (citing *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999)). "[T]he provision of merely more than a trivial educational benefit" is insufficient. *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006) (internal marks and citations omitted). When a state is unable to provide a FAPE, the state must reimburse the child's parents for the costs of attendance at a private school that is able to provide a FAPE. *D.S.*, 602 F.3d at 557.

The core of the IDEA is the collaborative process that it establishes between parents and schools. *Schaffer v. Weast*, 546 U.S. 49, 53 (2005). The IEP is the "central vehicle" for this collaboration, *id.*, and the "primary mechanism" for delivering a FAPE, *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007) (en banc). Under the IDEA, school districts must work with parents to design an IEP, which is a program of individualized instruction for each

___

(D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d)]."

20 U.S.C. § 1401(9).

14

special education student. 20 U.S.C. §§ 1412(a)(4), 1414(d). "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer*, 546 U.S. at 53 (citing 20 U.S.C. § 1414(d)(1)(A)). Although the IEP must provide the student with a "basic floor of opportunity," it does not have to provide "the optimal level of services," or incorporate every program requested by the child's parents. *D.S.*, 602 F.3d at 557 (citations omitted); *Tucker v. Bay Shore Union Free Sch. Dist.*, 873 F.2d 563, 567 (2d Cir. 1989) (explaining that the IDEA guarantees to a disabled child "an education that is appropriate, not one that provides everything that might be thought desirable by loving parents" (internal marks and citations omitted)). "[A]t a minimum, the IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential," *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 182 (3d Cir. 2009) (citation omitted), and "individual abilities," *Ridgewood Bd. of Educ.*, 172 F.3d at 248. *See Bd. of Educ. v. Diamond*, 808 F.2d 987, 991 (3d Cir. 1986) (stating that an IEP must "be likely to produce progress, not regression or trivial educational advancement") (citation omitted).

If parents believe that an IEP fails to provide their child with a FAPE, they may seek an administrative "impartial due process hearing." 20 U.S.C. § 1415(f). A school district may also request such a hearing, if, for example, it wants to change an existing IEP and the parents refuse, or if the parents refuse to allow their child to be

evaluated at all. *Schaffer*, 546 U.S. at 53. Although state authorities have limited discretion in determining who conducts the hearings and establishing hearing procedures, Congress has legislated the "central components" of the administrative hearings by providing minimal pleading standards, and affording all parties the right to counsel, the right to present evidence, and the right to cross-examine witnesses. *Id.* at 54. "Any party aggrieved by the findings and decision" made in the administrative proceeding "shall have the right to bring a civil action" in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

A threshold issue we are asked to consider in this case is which party bears the burden of persuasion before the district court. The IDEA does not specify which party bears the burden of persuasion at the district court level or at the administrative hearing level. Before 2005, we had always placed the burden of demonstrating compliance with the IDEA at the administrative hearing on the school district. *L.E.*, 435 F.3d at 391 (citing *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 579 (3d Cir. 2000); *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1219 (3d Cir. 1993)). However, in 2005, in *Schaffer v. Weast*, 546 U.S. at 62, the Supreme Court held that the burden of persuasion in an administrative hearing under the IDEA lies with the party seeking relief. The Court explained that it saw no reason to depart from "the ordinary default rule that plaintiffs bear the risk of failing to prove their claims." *Id.* at 56 (citing 2 J. Strong, McCormick on Evidence § 337, at 412 (5th ed. 1999)); *see L.E.*, 435 F.3d at 391 (discussing the significance of *Schaffer*).

16

However, *Schaffer* did not address which party should bear the burden of persuasion when a party aggrieved by the decision of the administrative hearing officer challenges that decision in district court. Nor have we explicitly decided this issue in articulating the district court's standard of review. We now join our sister circuits in holding that the party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged.[3] *See J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010); *Marshall Joint Sch. Dist. No. 2 v. C.D.*, 616 F.3d 632, 636 (7th Cir. 2010); *District of Columbia v. Doe*, 611 F.3d 888, 897 (D.C. Cir. 2010). As the Supreme Court noted in *Schaffer*, "[t]he burdens of pleading and proof with regard to most facts have been and should be assigned to

---

[3] Our conclusion today that the burden lies with the party challenging the administrative decision is entirely consistent with our previous cases, in which we held that the burden was properly placed on the parents before the district court. In those cases, the parents were the losing party before the hearing officer and challenged the hearing officer's decision in district court. *See Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 345 (3d Cir. 2007); *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 392 (3d Cir. 2006). We did not specify, however, whether the parents bore the burden because they initially challenged the IEP (and the burden carried to the district court) or because they lost at the administrative hearing level. As our decision today makes clear, the relevant consideration is the outcome of the administrative proceeding, not which party requests an administrative hearing.

the [party] who . . . seeks to change the present state of affairs." 546 U.S. at 56 (quoting McCormick on Evidence § 337, at 412). Under the IDEA, it is the party "aggrieved by the findings and decision" of the hearing officer that seeks to change the present state of affairs. *See* 20 U.S.C. § 1415(i)(2)(A). "Absent some reason to believe that Congress intended otherwise," we conclude that the burden of persuasion falls where it usually does, on the party seeking relief. *See Schaffer*, 546 U.S. at 57-58; *see also S.H.*, 336 F.3d at 270 (explaining that factual findings from the administrative proceeding are to be considered prima facie correct).

In this case, Parents argue that the District Court committed reversible error by placing the burden of persuasion on them as to all claims. We disagree. Although the District Court did, in fact, err by placing the burden on Parents with respect to the findings of the Hearing Officer that were challenged by Ridley, the error was harmless.[4] We will deem an error to be harmless if it is "highly probable" that it did not affect the outcome of the case. *Forrest v. Beloit Corp.*, 424 F.3d 344, 349 (3d Cir. 2005) (citation omitted). In a non-criminal case, an error regarding the placement of the burden of persuasion will frequently be harmless. *Schaffer*,

---

[4] We note that Parents filed counterclaims, in which they challenged the Hearing Officer's conclusion that Ridley did not violate the IDEA or the Rehabilitation Act during E.R.'s kindergarten year. Parents appropriately bore the burden of persuasion as to those claims because they were the party aggrieved by the Hearing Officer's decision.

18

546 U.S. at 56, 58. As the Supreme Court has explained, in a non-criminal case, the burden of persuasion only comes into play where the evidence is "closely balanced," *id.* at 56, i.e., in cases "in evidentiary equipoise," *id.* at 58. In this case, as we explain below, no factual issues are so "closely balanced" that the burden of persuasion would have affected the outcome of the case. *See id.* at 56. Although some of the disputed issues involve questions of fact, the Hearing Officer's errors stemmed largely from mistakes or omissions regarding the application of law to those facts. Questions of law, of course, are unaffected by the burden of persuasion. *El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232, 238 (3d Cir. 2007) (stating that the burden of persuasion is the burden "to persuade the factfinder that one's propositions of fact are indeed true" (citing Black's Law Dictionary 190 (7th ed. 1999))). Thus, we hold that it is "highly probable" that the District Court's error regarding the placement of the burden of persuasion did not affect the outcome. *Forrest*, 424 F.3d at 349.

## B.    "Child Find" Requirement

Parents contend that the District Court erred in reversing the Hearing Officer's determination that Ridley's failure to identify E.R. as a child in need of special education services in the beginning of first grade denied her a FAPE. We disagree. "School districts have a continuing obligation under the IDEA . . . to identify and evaluate all students who are reasonably suspected of having a disability." *P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009) (citation omitted); *see* 20 U.S.C. § 1412(a)(3) (explaining that states must "identif[y], locate[], and evaluate[]" all children

19

with disabilities who are in need of special education, and must develop "a practical method . . . to determine which children with disabilities are currently receiving needed special education and related services"). This is referred to as the IDEA's "child find" requirement. *Matula*, 67 F.3d at 492. Each state must establish procedures to fulfill this statutory directive. 34 C.F.R. § 300.111. Pennsylvania's "child find" procedures are set forth in 22 Pa. Code. §§ 14.121 through 14.125.

Neither the IDEA, its implementing regulations, nor the applicable Pennsylvania regulations establish a deadline by which children who are suspected of having a qualifying disability must be identified and evaluated. Accordingly, we have previously "infer[red] a requirement that this be done within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." *Matula*, 67 F.3d at 501.[5] In adopting the "reasonable time" standard, we noted the budgetary constraints and staffing pressures facing school officials, and emphasized that we were not

---

[5] In *W.B. v. Matula*, 67 F.3d 484 (3d Cir. 1995), we were dealing with a challenge to a school district's compliance with child find obligations under the IDEA and New Jersey law. However, because nothing in the Pennsylvania regulations establishes a specified timeline for identifying and evaluating students, we will apply the "reasonable time" standard to school districts in Pennsylvania as well. *See id.* at 501 (inferring the "reasonable time" requirement because neither the IDEA nor the applicable New Jersey regulations established such a deadline).

establishing any "bright-line rule" as to what constitutes a reasonable time. *Id.* Rather, we employ a case-by-case approach and assess whether the school district's response was reasonable "in light of the information and resources possessed" by the district at a given point in time. *Id.*

Here, in finding that Ridley denied E.R. a FAPE by failing to identify her as a student in need of special education services at the outset of first grade, the Hearing Officer never acknowledged that Ridley must be given a reasonable time to identify students as disabled. Rather, the Hearing Officer simply stated that Ridley had provided a number of intervention programs to E.R. during kindergarten, and because E.R. continued to struggle academically in first grade, Ridley should have known that further evaluation was required at the very start of the next school year. The Hearing Officer was particularly critical of E.R.'s first grade teacher, Janet Cenname, explaining that Cenname was "extremely nervous and uptight" when testifying, she had to refer to notes, and she frequently tried to explain her actions in a "non-sensical way." The Hearing Officer concluded that, based on E.R.'s struggles during the first month of first grade, much of which was spent reviewing kindergarten materials, Cenname should have identified E.R. as a student in need of special education services at the very beginning of the year, and thus should have recommended to Ridley that it conduct another evaluation. Accordingly, the Hearing Officer determined that Ridley denied E.R. a FAPE "from the beginning of first grade to the time that the evaluation was completed" in February 2008.

21

As the District Court observed, the Hearing Officer's finding that Ridley violated the IDEA by failing to identify E.R. as a child in need of special education services at the outset of first grade is difficult to reconcile with the Hearing Officer's finding that Ridley complied with the IDEA during E.R.'s kindergarten year. E.R. was evaluated during kindergarten, and although areas of weakness were found, E.R.'s academic skills were generally considered to be in the average range. The Hearing Officer concluded that the kindergarten evaluation was "substantively appropriate," and noted that "just because a child has an area of weakness, it doesn't necessarily mean that [she has] a disability." The Hearing Officer also noted that Ridley "appeared to be invested in addressing [E.R.'s] needs and providing appropriate instruction and interventions before rushing to special education identification." As a result, the Hearing Officer properly determined that Parents' claim that Ridley violated the IDEA's "child find" requirements during E.R.'s kindergarten year "lack[ed] any basis in the testimony or documents."[6]

In light of the fact that E.R.'s kindergarten evaluations were appropriate, and she did not qualify as a student in need of special education services in June 2007 (the end of kindergarten), we cannot agree with the Hearing Officer that Ridley violated the IDEA and denied E.R. a FAPE by failing to immediately reevaluate her in September 2007. When a

---

[6] Parents do not appeal the District Court's decision affirming the Hearing Officer's finding regarding E.R.'s kindergarten year.

school district has conducted a comprehensive evaluation and concluded that a student does not qualify as disabled under the IDEA, the school district must be afforded a reasonable time to monitor the student's progress before exploring whether further evaluation is required. *See Matula*, 67 F.3d at 501. We assess whether a school district identified and evaluated a student suspected of having a qualifying disability within a reasonable time "in light of the information and resources possessed" by the district. *Id.* Here, although E.R. struggled during the beginning of first grade, all prior evaluations showed that she did not require special education services. Moreover, as Cenname testified, first grade was the "first time that the children ever ha[d] a chance to be in a test taking situation" and "[t]here were other children that also had difficulty . . . taking a test." It was reasonable for Cenname to assess E.R.'s progress throughout the first marking period of first grade before recommending that E.R. again be evaluated to determine if she had a learning disability. The IDEA does not require a reevaluation every time a student posts a poor grade. Accordingly, we hold that Ridley complied with its "child find" obligations, and E.R. was not denied a FAPE at the beginning of first grade.[7]

---

[7] Parents contend that the District Court did not accord the proper deference to the Hearing Officer's factual findings, particularly her finding that Cenname was not a credible witness. Where a hearing officer "has heard live testimony and determined that one witness is more credible than another witness, [the hearing officer's] determination is due special weight." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d

Cir. 2010) (citation omitted). A district court must accept the hearing officer's credibility determinations "unless the non-testimonial extrinsic evidence in the record would *justify* a contrary conclusion." *Id.* (citations omitted). Here, central to the Hearing Officer's conclusion that E.R. was denied a FAPE during the beginning of first grade was that Cenname "put off" meeting with E.R.'s mother when E.R.'s mother expressed concern that her daughter had failed a math test. However, Cenname responded to E.R.'s mother's request for a meeting by sending back the following note:

> Dear Mrs. [R],
>
> I appreciate your concern about [E.R.'s] test, but it is very early in the year. We need to give her some time. Continue to work with her at home and reinforce what we are doing in class. I will probably be out from Oct. 2 – Oct. 15. If you still have concerns at that time, I will be happy to meet.

24

### C.	E.R.'s IEP

Parents next contend that the District Court erred in reversing the Hearing Officer's finding that E.R.'s IEP was inadequate. For the reasons set forth below, we disagree. First, to the extent Ridley violated the IDEA's procedural requirements by failing to include the requisite statement of specially designed instruction in the IEP, the violation was not actionable because it did not have any impact on the substantive rights of E.R. or Parents. Second, contrary to the Hearing Officer's findings, E.R.'s educational plan included a peer-reviewed reading program, which, in conjunction with the other services that E.R. was scheduled to receive, was sufficient to provide a FAPE. We will discuss these points in turn.

1.

An IEP must consist of a detailed written statement arrived at by a multi-disciplinary team specifying the

---

Thus, contrary to Parents' suggestions, Cenname did not refuse to meet or indicate that a meeting was unnecessary. She expressed a clear willingness to meet, and simply told Parents that E.R. should be given some time to get her bearings. Parents never responded to this note and never met with Cenname to discuss E.R.'s academic struggles. Therefore, as the District Court found, non-testimonial evidence in the record demonstrates that Cenname's response to Parents' request for a meeting was entirely reasonable, and that it in no way resulted in the denial of a FAPE. *See D.S.*, 602 F.3d at 564.

services, including specially designed instruction, that the child will receive. *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 173 (3d Cir. 1988). Parents contend that they are entitled to compensatory education because the IEP developed by Ridley failed to set forth in sufficient detail the specially designed instruction that would be provided to E.R. Parents acknowledge that subsequent NOREPs issued by Ridley included the required specially designed instruction, but they nevertheless argue that the IDEA requires that such information be included in the body of the initial IEP.[8]

Parents' argument presents a challenge to Ridley's compliance with the IDEA's procedural requirements. Although we have held that "[t]he content of an IEP . . . does not implicate the IDEA's procedural requirements for content is concerned with the IEP's substance," *D.S.*, 602 F.3d at 565, Parents' argument here does not relate to the substance of the IEP. Rather, Parents' argument is essentially that Ridley violated the IDEA by including a description of specially designed instruction in the wrong document. We have made clear that although it is important that a school district comply with the IDEA's procedural requirements, compliance is not a goal in itself; rather, compliance with such procedural requirements is important because of the "requirements' impact on students' and parents' substantive rights." *Id.*

---

[8] Although the District Court did not address this issue, Parents raised it in their brief before the District Court, and thus preserved it for review. *See Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 183-84 (3d Cir. 2009).

26

Accordingly, "[a] procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." *Id.* (citing *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 525-26 (2007)) (second citation omitted).

Here, to the extent that the absence of specially designed instruction in the IEP constituted a procedural violation, it did not affect the substantive rights of E.R. or Parents, and thus does not entitle Parents to an award of compensatory education. *See id.* Although Parents correctly note that the initial IEP did not specify all of the special education services that E.R. would receive, subsequent NOREPs contained that information. A NOREP issued on May 9, 2008, provided that the educational placement recommended for E.R. was "[r]esource room learning support for math and reading in which a direct reading program will be done as well as a direct phonemic based program to address [E.R.'s] needs in decoding vocabulary, fluency and comprehension skills." The May NOREP further stated that E.R. would receive "at least 60 minutes per day instruction for reading and at least 60 minutes per day math at Grace Park Elementary School until June 2008." The NOREP indicated that an IEP Team meeting would be convened in June to review E.R.'s progress and discuss the implementation of *Project Read* for the 2008-2009 school year. Parents signed and approved the May NOREP. On June 9, 2008, Ridley issued a second NOREP, which explained that Ridley would provide training to its staff on *Project Read* during the summer and the program would be

27

up and running before the end of September 2008. Until *Project Read* could be implemented, Ridley would continue to use the other resource room reading programs. The June NOREP was never signed by Parents due to their objection to *Project Read*.

Because detailed specially designed instruction was set forth in the NOREPs, it is properly considered part of E.R.'s overall educational plan. Ridley's admitted "mistake" in failing to include such information in the IEP itself did not deny E.R. any educational opportunity, nor did it deprive her of any educational benefits. *See D.S.*, 602 F.3d at 565. Moreover, Parents were intimately involved in the process of crafting E.R.'s IEP and do not contend that they were unaware of the services E.R. was scheduled to receive. Thus, they were not denied their participation rights. *See id.* Accordingly, any deficiency in Ridley's compliance with the procedural requirements of the IDEA is not a basis for granting relief to Parents. Whether the specially designed instruction set forth in the IEP and the NOREPs was adequate to provide a FAPE is a separate question, which we will address next.

2.

Parents' next argument presents an issue of first impression in this circuit. The Hearing Officer found that E.R.'s IEP was inadequate, both for the end of the 2007-2008 school year (first grade), and all of the 2008-2009 school year (second grade) primarily because it "fail[ed] to provide a scientifically research-based, peer reviewed reading program, which [E.R.] needed in order to make meaningful progress."

The Hearing Officer stated that although *Project Read*, the reading program chosen for E.R., "was designed to be research based," there were "flaws in the research supporting it." These statements were made in conclusory fashion, without elaboration, in a footnote of the Hearing Officer's 20-page opinion. They were not well-explained or well-supported.

The District Court reversed the Hearing Officer's decision that the IEP was inappropriate, reasoning that the lack of a peer-reviewed instructional program was not automatically fatal to an IEP, and even if it was, *Project Read* was research-based and peer-reviewed. On appeal, we need not decide whether the lack of a peer-reviewed reading program alone may result in the denial of a FAPE because we agree with the District Court that *Project Read* was based on peer-reviewed research. We will, however, consider Parents' contentions that Ridley denied E.R. a FAPE because the available research regarding *Project Read* was flawed and did not adequately demonstrate that *Project Read* would be effective for a student with E.R.'s learning disabilities. As we explain below, Parents' arguments are unavailing; the peer-reviewed specially designed reading instruction in E.R.'s IEP was "reasonably calculated to enable [her] to receive meaningful educational benefits in light of [her] intellectual potential." *Chambers*, 587 F.3d at 182 (citation omitted). Ridley was not required to choose the reading program based on the optimal level of peer-reviewed research, or to implement the specific program requested by Parents.

We begin our analysis by reviewing the statutory provision at issue. In 2004, Congress added the following

29

provision to the IDEA: "[t]he term 'individualized education program' or 'IEP' means a written statement for each child with a disability . . . that includes . . . a statement of the special education and related services and supplementary aids and services, *based on peer-reviewed research to the extent practicable*, to be provided to the child." 20 U.S.C. § 1414(d)(1)(A)(i)(IV) (emphasis added). This provision was incorporated into the revised IDEA regulations in 2006, which state that an IEP "must include . . . [a] statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child." 34 C.F.R. § 300.320(a)(4). Congress amended the IDEA in 1997 and 2004, in part, to respond to concerns that the statute "ha[d] been impeded by low expectations, and an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities." 20 U.S.C. § 1400(c)(4). The IDEA's statement of congressional findings explains that "[a]lmost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by" training teachers on "the use of scientifically based instructional practices, to the maximum extent possible," and providing incentives for "scientifically based early reading programs." *Id.* § 1400(c)(5)(E) and (F).

Unfortunately, neither the text of the IDEA nor the IDEA regulations provide much guidance as to the effect of § 1414(d)(1)(A)(i)(IV)'s peer-reviewed research provision in this case. Therefore, we will look to other instructive regulatory materials. *See Auer v. Robbins*, 519 U.S. 452, 462

30

(1997) (explaining that when interpreting a statute and its implementing regulations, we may look to the agency's interpretation of its own regulations); *United States v. Occidental Chem. Corp.*, 200 F.3d 143, 151-52 (3d Cir. 1999) (stating that we must defer not only to interpretations supported by notice-and-comment rulemaking, but also "informal interpretations"); *Cleary v. Waldman*, 167 F.3d 801, 808 (3d Cir. 1999) ("[I]f an agency has been granted administrative authority by Congress for a statute, its interpretation—despite arising in an informal context—will be given deference as long as it is consistent with other agency pronouncements and furthers the purposes of the Act."). In conjunction with its promulgation of the 2006 IDEA regulations, the U.S. Department of Education ("DOE") issued an Analysis of Comments and Changes to the 2006 IDEA Regulations ("Analysis of IDEA Regulations"), 71 Fed. Reg. 46,540 (2006). In response to a comment requesting "clear guidance on the responsibilities of States, school districts, and school personnel to provide special education and related services . . . that are based on peer-reviewed research," the DOE stated that "States, school districts, and school personnel must . . . select and use methods that research has shown to be effective, to the extent that methods based on peer-reviewed research are available." 71 Fed. Reg. at 46,665. The agency made clear, however, that a student's IEP team retains flexibility in devising an appropriate program. The Analysis of IDEA Regulations explained that the changes implemented by the 2004 IDEA amendments and the 2006 updated regulations

31

"do[] not mean that the service with the greatest body of research is the service necessarily required for a child to receive FAPE. Likewise, there is nothing in the Act to suggest that the failure of a public agency to provide services based on peer-reviewed research would automatically result in a denial of FAPE. The final decision about the special education and related services . . . that are to be provided to a child must be made by the child's IEP Team based on the child's individual needs."

*Id.*

In response to a comment requesting that the DOE require programs provided to a disabled child to be research-based with demonstrated effectiveness in addressing the particular needs of a child, the Analysis of IDEA Regulations stated, "[w]hile the Act clearly places an emphasis on practices that are based on scientific research, there is nothing in the Act that requires all programs provided to children with disabilities to be research-based with demonstrated effectiveness in addressing the particular needs of a child where not practicable." *Id.* The DOE declined to adopt the recommended change because "ultimately, it is the child's IEP Team that determines the special education and related services that are needed by the child in order for the child to receive FAPE." *Id.* The DOE also rejected as "overly burdensome" a requirement that all IEP team meetings include a focused discussion of research-based methods and a proposed regulation that would force schools to provide

32

written notice when an IEP team does not provide documentation of research-based methods. *Id.*[9]

We can discern two key principles from these administrative materials and our prior decisions interpreting the IDEA. First, although schools should strive to base a student's specially designed instruction on peer-reviewed research to the maximum extent possible, the student's IEP team retains flexibility to devise an appropriate program, in light of the available research. *See D.S.*, 602 F.3d at 557; 71 Fed. Reg. at 46,665. Second, under the IDEA, courts must accord significant deference to the choices made by school officials as to what constitutes an appropriate program for each student. *See D.S.*, 602 F.3d at 556-57; *Ridgewood Bd. of Educ.*, 172 F.3d at 247; 71 Fed. Reg. at 46,664-65.

With these principles in mind, we will consider the two objections that Parents raise to the portion of E.R.'s IEP that addresses her reading and language disabilities. First, echoing the findings of the Hearing Officer, Parents argue that "there were flaws in the research [regarding the

---

[9] Commenters also requested a more explicit definition of "peer-reviewed research." The DOE stated that "'[p]eer reviewed research' generally refers to research that is reviewed by qualified and independent reviewers to ensure that the quality of the information meets the standards of the field before the research is published." 71 Fed. Reg. 46,540, 46,664 (2006). However, the agency made clear that there was no single definition of "peer-reviewed research" and it declined to include a specific definition for purposes of the IDEA. *Id.*

33

effectiveness of *Project Read*] which made it impossible to attribute the reading growth the students experienced [in the studies] to *Project Read* alone." Second, they contend that none of the studies regarding *Project Read* demonstrated that the program was effective for students with E.R.'s specific disabilities. Both arguments miss the mark. Given that the IDEA does not require an IEP to provide the "optimal level of services," *D.S.*, 602 F.3d at 557 (citations omitted), we likewise hold that the IDEA does not require a school district to choose the program supported by the optimal level of peer-reviewed research. Rather, the peer-reviewed specially designed instruction in an IEP must be "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." *Chambers*, 587 F.3d at 182 (citation omitted).

According to a 2007 review of *Project Read* published by the Florida Center for Reading Research ("FCRR"):

> "*Project Read* is a comprehensive language arts program designed to provide explicit instruction in a structured reading curriculum. The goal of the program is to help all students become thoughtful, purposeful, and independent readers. *Project Read* Curriculum may be implemented in the regular classroom, special education classes, and Title I classes. It may also be used as an intervention reading program for first through sixth graders or with adolescents and adults who struggle with reading or language learning. Whole or small group instruction is delivered by a classroom

34

teacher, a special education teacher, or a reading teacher. Lessons are intended to occur daily within an extended block of time devoted to reading instruction. Emphasis is placed on systematic, direct instruction of concepts and skills supported and enhanced by a teaching approach that includes visual, kinesthetic, auditory and tactile strategies (VAKT), and the use of body language."

After discussing several studies on the effectiveness of *Project Read*, and citing relevant articles, at least one of which was published in a peer-reviewed journal, the FCRR review concluded that the research "[was] promising and the instructional strategies of *Project Read* [we]re aligned with current research. Future studies with sound experimental designs including control groups and random assignment may contribute more definitive information about the efficacy of *Project Read*." The FCRR review then listed numerous strengths of the *Project Read* program, and found no weaknesses in *Project Read*'s curriculum.

We understand Parents' concern that the available studies did not test *Project Read*'s effectiveness for students with E.R.'s unique combination of disabilities. However, the research discussed in the FCRR review involved children of E.R.'s age who struggled with reading, and indicated that *Project Read* was helpful in improving the reading skills of such students. Additionally, Hodges, Grace Park's resource room teacher, and Woods, Ridley's director of special education, both of whom have expertise in the field of special education, testified that *Project Read* was an appropriate

reading program for E.R.[10]  Woods explained that, "*Project Read* is a multi-sensory program that is based on Orton Gillingham's principles that support learning disabled students.  The research from Florida was very promising in terms of these students doing quite well."  Woods further testified that "[t]he program . . . had a lot of components that learning disabled students learn by [including] what we called VAKT program, visual, auditory, kinesthetic, and touch.  And most learning disabled students do very well when you bring all of the senses into the learning process."  Hodges also testified that *Project Read* was a research-based program and similar to other reading programs, such as *The Wilson Reading System*.

Parents argue that, in contrast to *Project Read*, the program they requested, *The Wilson Reading System*, has been shown to be effective for teaching students with learning disabilities similar to those of E.R.  However, Ridley did not have to choose the specific program requested by Parents.  *See D.S.*, 602 F.3d at 557.  Nor did it have to choose the program supported by the optimal level of peer-reviewed research.  *See id.*; 71 Fed. Reg. at 46,665 (explaining that a school does not have to choose the program supported by the "greatest body of research").  "The IDEA accords educators discretion to select from various methods for meeting the individualized needs of a student, provided those practices are reasonably calculated to provide h[er] with educational benefit."  *R.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117,

---

[10] The Hearing Officer did not discuss the assessments of *Project Read* provided by Hodges and Woods.

36

1122 (9th Cir. 2011) (citations omitted); *see Rowley*, 458 U.S. at 207 (explaining that school districts have "[t]he primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs"). In selecting special education programs, a school district must be able to take into account not only the needs of the disabled student, but also the financial and administrative resources that different programs will require, and the needs of the school's other non-disabled students. *See J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70 (2d Cir. 2000) (explaining that, in the context of the Rehabilitation Act, courts must be aware of the "need to strike a balance" between the rights of the disabled student and fiscal and administrative concerns); 71 Fed. Reg. at 46,665 (rejecting a proposed requirement on an IEP team as "overly burdensome").

We will not set forth any bright-line rule as to what constitutes an adequately peer-reviewed special education program; hearing officers and reviewing courts must continue to assess the appropriateness of an IEP on a case-by-case basis, taking into account the available research. We recognize that there may be cases in which the specially designed instruction proposed by a school district is so at odds with current research that it constitutes a denial of a FAPE. *See, e.g., Waukee Cmty. Sch. Dist. v. D.L.*, No. 07-00278, 51 IDELR 15 (LRP) (S.D. Iowa Aug. 7, 2008) (explaining that a student was denied a FAPE, in part, because the school district frequently employed strategies which contradicted the relevant research and were even inconsistent with the school's own assessment of the

37

appropriate program for the student).[11]  Additionally, if it is practicable for a school district to implement a program based upon peer-reviewed research, and the school fails to do so, that will weigh heavily against a finding that the school provided a FAPE.  However, that is not the case here.  Ridley relied on available peer-reviewed research in crafting the IEP for E.R., and proposed a program with specially designed instruction that was "reasonably calculated" to enable her to achieve meaningful educational benefits in light of her intellectual potential and individual abilities.  *See Rowley*, 458 U.S. at 207.  Thus, we conclude that the District Court

---

[11] The IDEA's peer-reviewed research requirement is not set forth in isolation; it is part of a broader section discussing the content of the IEP, which requires "a statement of the special education and related services . . . that will be provided for the child" to meet certain specified objectives, namely  "to advance appropriately toward attaining the annual goals[,]" "to be involved in and make progress in the general education curriculum . . . and to participate in extracurricular and other nonacademic activities[,]" and "to be educated and participate with other children with disabilities and nondisabled children in" educational activities.  20 U.S.C. § 1414(d)(1)(A)(i)(IV).

properly reversed the Hearing Officer's finding that the IEP was inadequate to provide a FAPE.[12]

---

[12] The Hearing Officer also awarded Parents compensatory education for the end of the 2007-2008 school year, despite the fact that *Project Read* was not yet implemented, and Ridley was continuing to use its existing "resource room" reading program. The Hearing Officer did not explain this conclusion, and based on the record, we cannot agree. Pursuant to E.R.'s IEP and the May NOREP, both of which Parents agreed to, for the last eighteen days of first grade, E.R. received one hour of reading instruction in the resource room. The resource room reading curriculum consisted of *Reading Naturally*, *Reading Workshop*, *Writing Workshop*, and *Patricia Cunningham's Systematic Phonics*. Hodges testified that although the same programs were used for all students in the resource room, she tailored the programs to each student's individual needs. Moreover, E.R.'s evaluations all indicated that she would benefit from multi-sensory learning, and Hodges explained that all activities done in the resource room were multi-sensory. She also explained that "all of the research points to a balanced literacy program which is hammering away at phonemic awareness, phonics, comprehension, fluency, and vocabulary. And with the repertoire that we were using throughout the week, I think we hit all those schools." We can find no evidence in the record that rebuts this testimony. In light of the fact that reviewing courts must be mindful not to substitute their views of what constitute preferable educational methods for those of school officials, who have

39

## D.      Section 504 of the Rehabilitation Act

Parents next contend that the District Court erred in reversing the Hearing Officer's determination that Ridley violated § 504 of the Rehabilitation Act during E.R.'s first grade year. We disagree. The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" under any program that receives federal funds. 29 U.S.C. § 794(a). This prohibition was extended to public school systems through § 504. *Id.* § 794(b)(2)(B). To establish a violation of § 504 of the Rehabilitation Act, Parents were required to prove that (1) E.R. was disabled; (2) she was "otherwise qualified" to participate in school activities; (3) Ridley received federal financial assistance; and (4) E.R. was excluded from participation in, denied the benefits of, or subject to

---

expertise in the area, *D.S.*, 602 F.3d at 564, we agree with the District Court that the Hearing Officer erred in determining that Ridley denied E.R. a FAPE during the end of first grade.

Because we hold that the resource room instruction provided during the end of the 2007-2008 school year was sufficient to provide a FAPE, we likewise hold that the Hearing Officer erred in finding that the IEP was inadequate for September 2008 (the first month of second grade). The same programs that were used during the end of first grade were scheduled to be used in September, until *Project Read* was ready to be implemented.

40

discrimination at Ridley. *Ridgewood Bd. of Educ.*, 172 F.3d at 253. Here, the parties dispute only the fourth element.

As we have explained, § 504's "negative prohibition" is similar to the IDEA's "affirmative duty" and also requires schools that receive federal financial assistance to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction." *Matula*, 67 F.3d at 492-93 (quoting 34 C.F.R. § 104.33(a)). To offer an "appropriate" education under the Rehabilitation Act, a school district must reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits. *See J.D.*, 224 F.3d at 70 (citing *Alexander v. Choate*, 469 U.S. 287, 300 n.20 (1985)); *D.S.*, 602 F.3d at 556 (explaining that under the IDEA, a state must supply an education that provides "significant learning" and "meaningful benefit") (citation omitted); *Ridgewood Bd. of Educ.*, 172 F.3d at 253.[13] However, § 504 does not mandate "substantial" changes to the school's programs, *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 405 (1979), and courts "should be mindful of the need to strike a balance between the rights of the student and h[er] parents and the legitimate financial

---

[13] The regulations implementing § 504 of the Rehabilitation Act state: "the provision of an appropriate education is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met. . . ." 34 C.F.R. § 104.33(b)(1).

41

and administrative concerns of the [s]chool [d]istrict," *J.D.*, 224 F.3d at 70-71 (internal marks and citation omitted). But "[t]he fact that it is more convenient, either administratively or fiscally, to provide services in a segregated manner, does not constitute a valid justification for separate or different services." *Helen L. v. DiDario*, 46 F.3d 325, 338 (3d Cir. 1995) (quoting H.R. Rep. No. 485, *reprinted in* 1990 U.S.C.C.A.N. at 473).

In June 2006, prior to E.R.'s kindergarten year, Ridley prepared an Allergy Treatment Plan, which alerted school staff to E.R.'s allergies and the signs of an allergic reaction, and explained how school officials should react if E.R. were to have an allergic reaction. In February 2007, a § 504 Service Agreement was implemented to further address E.R.'s health issues. The Service Agreement reflected Parents' request that E.R. be included in as many activities as possible, and provided that because E.R. was "only to eat foods provided by parents," Parents were to be contacted before activities involving shared food so that appropriate alternatives could be provided. The Service Agreement also required all students in the classroom to wash their hands before and after meals, required E.R. to wash her hands after touching physical education or OT equipment, mandated that E.R. wear gloves provided by Parents when handling glue, and provided that E.R. would only use supplies and utensils provided by Parents.

Parents allege that Cenname "stubbornly and persistently" refused to implement the Service Agreement, which led to E.R. being "singled out, isolated and denied full participation with her classroom peers." The Hearing Officer

42

cited the following incidents as evidence of Ridley's discrimination against E.R. First, as part of a "Clifford the Dog" celebration, E.R.'s classmates were given brownies with red icing and red juice, but because E.R.'s allergies prevented her from eating that food, she was given a cupcake from the nurse's freezer that had been provided by her mother. Second, a program on nutrition was offered, along with a specific snack. Although Parents were notified of the program in advance, they were not told what the snack would be, and therefore, E.R. ended up having to eat a snack from home. Third, according to E.R.'s mother, Cenname cancelled an Earth Day project rather than design an alternative snack for E.R. E.R.'s mother testified that Cenname commented that she did not understand why the other students in class should have to accommodate one child when E.R.'s parents could provide separate food. Fourth, due to her allergies, E.R. was required to wear loose cotton clothes. E.R.'s mother testified that she often had difficulty locating reasonably priced clothing that complied with Ridley's dress code: green shirts, khaki pants, and a white sweater. Despite this difficulty, on two occasions, Cenname remarked to E.R. that her clothes were not in compliance with the dress code, which according to Parents, caused E.R. to "feel[] humiliated." Fifth, students in E.R.'s first grade class participated in an activity in which they worked with partners to sift sand, pebbles, and gravel, and compare the various shapes and sizes. Due to her severe allergies, E.R. was not permitted to touch dirt without using gloves. Cenname testified that she had forgotten about the sand activity when preparing her update to E.R.'s mother, and thus, was unsure whether E.R. could touch any of the materials. "To be safe," Cenname

43

instructed E.R. to let her partner handle the materials, but E.R. was allowed to participate in the project in every other way. Finally, E.R. was given several poor grades on penmanship tests. Parents blame this on Cenname's failure to notice that E.R.'s chair did not allow her to brace herself for writing tasks.

We agree with the District Court that although each of these incidents "may illustrate how E.R.'s daily school routine necessarily had to be different than her classmates," they do not constitute § 504 violations. *Ridley*, 2011 WL 499966, at \*17. There is no evidence in the record that E.R. was excluded from participation in educational activities, denied educational benefits, or otherwise subjected to discrimination. *See Ridgewood Bd. of Educ.*, 172 F.3d at 253. E.R. was not denied meaningful participation in the food-related activities; she simply had to eat something slightly different than the food eaten by her classmates. Parents argue that Cenname could have complied with the Rehabilitation Act by allowing E.R.'s mother to prepare snacks for the entire class that were suitable to E.R.'s dietary needs. The statute simply does not require that. *See Davis*, 442 U.S. at 410 (explaining that the Rehabilitation Act distinguishes "between the evenhanded treatment of qualified handicapped persons and affirmative efforts to overcome the disabilities caused by handicaps"). Similarly, E.R. was not denied the educational benefit of the sand, pebbles, and gravel lesson, even though she was not allowed to touch the materials. Contrary to Parents' suggestions, this case does not involve a situation in which a school district attempted to provide separate-but-equal services to a disabled student. *See Helen L.*, 46 F.3d at

44

338. Ridley took reasonable steps to accommodate E.R.'s disabilities and include her in all class activities; it was not required to grant the specific accommodations requested by Parents or otherwise make substantial modifications to the programs that were used for all other students. *J.D.*, 224 F.3d at 70. Additionally, although Cenname may have exercised poor judgment in commenting on E.R.'s clothes, in the absence of evidence that E.R. was excluded from participation in educational activities or denied educational benefits, two isolated comments do not rise to the level of a § 504 violation. *See Ridgewood Bd. of Educ.*, 172 F.3d at 253. Nor does Cenname's alleged failure to identify the position of E.R.'s chair as the source of her struggles on penmanship tests.

### E. Other Claims

Finally, Parents argue that the District Court erred in dismissing their claim for damages under the Rehabilitation Act, their claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and a state law claim against Cenname for "outrageous conduct causing severe emotional distress." Parents contend that these claims were not the subject of Ridley's motion for judgment on the administrative record, and thus were not before the District Court. Accordingly, Parents ask us to remand to the District Court to consider their remaining claims. We decline to do so; although the District Court did not address the claims, we can affirm based on any grounds supported by the record.

45

*Chambers*, 587 F.3d at 183-84.[14]   First, because Parents' Rehabilitation Act claim fails, they are not entitled to damages.  Second, the substantive standards for determining liability under the Rehabilitation Act and the ADA are the same, *McDonald v. Pa. Dep't of Pub. Welfare*, 62 F.3d 92, 94-95 (3d Cir. 1995), and thus the District Court did not err in disposing of Parents' claim under the ADA.  Finally, because no federal claims remained, dismissal of Parents' state law claim was proper under 28 U.S.C. § 1367(c)(3).

## IV.  Conclusion

For the foregoing reasons, we will affirm the order of the District Court.

---

[14] Although the principle that an appellate court may affirm on any grounds supported by the record has previously been articulated in the summary judgment context, it is based on considerations of judicial efficiency, and we see no reason not to apply the same principle to a district court's grant of judgment on the administrative record.

46