NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 17-3800

———————

KEVIN CULLEY, and; DENISE CULLEY, on behalf of; J.C.

v.

CUMBERLAND VALLEY SCHOOL DISTRICT,

Appellant

———————

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 1-15-cv-00857)
District Judge: Honorable John E. Jones, III

———————

Argued November 6, 2018

Before: AMBRO, SCIRICA, and RENDELL, Circuit Judges

(Opinion filed: December 20, 2018)


Mark W. Cheramie Walz          [Argued]
Sweet, Stevens, Katz & Williams LLP
331 East Butler Avenue
P.O. Box 5069
New Britain, PA 18901
  *Counsel for Appellant*

Judith A. Gran          [Argued]
Reisman Carolla & Gran LLP
19 Chestnut Street
Haddonfield, NJ 08033

Phillip A. Drumheiser
P.O. Box 890
Carlisle, PA 17013
    *Counsel for Appellees*

————————————

OPINION[*]

————————————

AMBRO, Circuit Judge

J.C., son of plaintiffs Kevin and Denise Culley, was diagnosed with Crohn's disease at age six. It is a painful, even debilitating, disease that affects the digestive tract and can cause abdominal pain, diarrhea, fatigue, weight loss, and malnutrition. It can even be life-threatening. *See* Mayo Clinic, *Crohn's Disease* (Mar. 8, 2018), *available at* https://www.mayoclinic.org/diseases-conditions/crohns-disease/symptoms-causes/syc-20353304. After a disciplinary dispute with J.C.'s school, part of the Cumberland Valley School District system, that resulted in his expulsion, J.C.'s parents filed suit claiming that Cumberland had violated J.C.'s rights under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, and under Section 504 of the Rehabilitation Act. 29 U.S.C. § 701 *et seq.* The District Court agreed, and we now affirm.

Born in 1998, J.C. was diagnosed with Crohn's disease in 2004. Cumberland was informed of the diagnosis in 2007. App. at 53. J.C.'s performance in school was generally strong through his sixth grade year, in 2009–2010, and he did not have

———————————————————

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

significant behavioral or social difficulties through that time. *Id*. at 130–131. But from seventh grade onward, both J.C.'s academic performance and his disciplinary record took significant turns for the worse. From seventh through tenth grade, when the incident giving rise to this lawsuit occurred and he was expelled, J.C. maintained a grade point average just above a failing mark of 70, had numerous disciplinary incidents, and was increasingly absent from school. *Id*. at 128, 131, 169–170. By tenth grade J.C. was absent 43 times, or over 30% of the time.

In April 2013, while in ninth grade, J.C. was admitted to Hershey Medical Center for surgery. Shortly thereafter in May, the school received a letter from his physician stating that J.C. should be allowed to cease activities during his physical education classes if he experienced pain. *Id*. at 170. In July 2013 the school received another letter from J.C.'s doctor stating that he should be allowed to leave class to use the bathroom on a liberal basis. *Id*. It appears Cumberland agreed to these accommodations.

On January 17, 2014, J.C. had a disciplinary incident where he, apparently along with several friends, attempted to leave the school grounds during the day. The other students fled, while J.C. was apprehended and had disciplinary proceedings brought against him, with an eye toward expulsion. After J.C.'s doctor wrote a letter to the school on January 27, 2014, giving a fuller account of J.C.'s diagnosis and the accommodations he required, his parents filed a due process complaint under the IDEA on January 29. Cumberland adopted a Section 504 Service Plan for J.C. in March 2014, which provided for a number of accommodations, including an "any time pass" to go to the nurse or the bathroom, extra time to complete assignments, and the provision of class notes in case of

frequent absences.  *Id*. at 92–94.  After receiving a letter from J.C.'s doctor stating that he should receive homebound instruction for half of each school day, Cumberland tried to implement this accommodation as well, but things did not go well.  J.C. was rarely present when the instructor arrived at his house, and even when present was not motivated or cooperative.  *Id*. at 107–116.

The school board voted to expel J.C. on April 7, 2014, with the expulsion taking effect on May 8, 2014.  At the same time, Cumberland released its Evaluation Report from its psychologist's evaluation of J.C.  *Id*. at 123.  The report concluded that he did not have a "qualifying disability" and thus was not eligible for special education under the IDEA.  *Id*. at 152.  It also stated that there was insufficient evidence that J.C.'s Crohn's disease was responsible for his difficulties in school, and that his condition called for Section 504 accommodations, not IDEA specialized instruction.  J.C.'s parents then requested an independent educational evaluation (IEE), which reached the opposite conclusion.  *Id*. at 162–192.  Noting the pervasive effect of Crohn's on J.C.'s life, the IEE found that he was eligible for special education under the IDEA and gave numerous "recommendations for specially designed instruction" to help tailor J.C.'s education to his benefit.  *Id*. at 189–191.  It also found that J.C. had ADHD and specific learning disabilities as to math and listening comprehension.  *Id*. at 189.  After J.C. moved to a neighboring school district, East Pennsboro, for the 2014–'15 school year, that district adopted an individualized education program (IEP) for J.C. to provide special education under the IDEA.  *Id*. at 249–279.

4

Meanwhile, the Hearing Officer on J.C.'s due process complaint held a hearing and issued his decision in February 2015. He found that J.C. was not eligible for special education under the IDEA because, even though Crohn's disease was a qualifying disability, it did not require specialized instruction. *Id.* at 48. The Hearing Officer endorsed Cumberland's Evaluation Report and largely dismissed the findings from the IEE. He noted that while J.C.'s frequent absences doubtless caused much of his academic decline, it was not clear that most or all of these absences were caused by Crohn's. *Id.* The Hearing Officer also concluded that, while J.C. was unambiguously covered by Section 504, Cumberland had met all of its obligations under that statute by providing every accommodation requested by his family. *Id.* at 50–51.

J.C.'s parents then timely filed a civil action on his behalf in the Middle District of Pennsylvania challenging the Hearing Officer's decision. *See Culley et al. v. Cumberland Valley School District*, No. 1:15-cv-00857-JEJ (M.D. Pa. 2015). Ruling on the parties' cross-motions for judgment on the record, the District Court reversed the Hearing Officer, finding that J.C. was eligible under the IDEA, that Cumberland had violated its "Child Find" duty to identify students with disabilities, and that it violated Section 504 by failing to evaluate J.C. prior to March 2014. Op. at 26 (App. at 28). Cumberland now appeals, arguing that the District Court erred by (1) reversing the Hearing Officer's determination that Cumberland's Evaluation Report was appropriate, (2) finding that J.C. was eligible for special education under the IDEA, and (3) finding that Cumberland breached its "Child Find" duty.

The District Court had original jurisdiction under 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(2). We have appellate jurisdiction under 28 U.S.C. § 1291. We review afresh the District Court's conclusions of law, including whether it applied the correct legal standards under the IDEA, and we review its findings of fact for clear error. *Ridley School District v. M.R.*, 680 F.3d 260, 268 (3d Cir. 2012). As to the merits, we review the state administrative decision under the so-called "modified *de novo*" standard, under which the hearing officer's findings of fact are given "due weight" and treated as "*prima facie* correct," which means that, if the Court disagrees with those findings, it must explain the basis for its disagreement. *Id.* This is not substantively different from *de novo* review, though courts are cautioned not to substitute their view of sound educational policy for that of local school authorities. *Id.*

Cumberland's first argument on appeal, concerning the "appropriateness" of the Evaluation Report, seems to involve a category error on its part. Neither the District Court's decision nor the Hearing Officer used the word "appropriate" in connection with the Evaluation Report. Nor do the statutory and regulatory provisions governing IDEA evaluations. *See* 20 U.S.C. § 1414(b), 34 C.F.R. § 300.304. The cases Cumberland cites concern whether an IEP adopted under the IDEA is appropriate. *See, e.g.*, *Board of Education of Hendrick Hudson Central School District, Westchester Co. v. Rowley*, 458 U.S. 176 (1982). The deference commended by *Rowley* and the other cases Cumberland cites, therefore, goes not to the threshold question of eligibility under the IDEA but how best to tailor the education of children to their unique needs once they are found eligible.

That is of no relevance to this case, where Cumberland found J.C. ineligible for IDEA special education.

The question of the weight to be given to the Evaluation Report, and to the IEE, is undoubtedly key to the main issue in this case, namely whether J.C. is in fact qualified for special education under the IDEA. Cumberland does identify one problem in the District Court's analysis: it misquoted the Report as stating that there was "insufficient evidence to determine eligibility based on the category of Other Health Impairment," when in fact the Report said that there was "insufficient information that [J.C.] has limited alertness due to a medical condition." *Compare* Op. at 11 (App. at 13), App. at 152. Hence the Report was not incomplete.

The rest of Cumberland's arguments misread the record. The District Court did not neglect the second prong of IDEA eligibility—that a student need not only have an eligible disability but must also require specially designed instruction due to that disability. Rather, its opinion explicitly referred to the correct set of criteria. Op. at 9. And while the Court did not discuss in detail J.C.'s need for specially designed instruction, it did give reasons why the Hearing Officer was wrong to discount the IEE, which contained detailed instructions for ways J.C.'s instruction should be modified to suit his needs. If credited, then, the IEE provides ample support for finding that J.C. was IDEA eligible. And we agree that the IEE paints a fuller and more accurate picture of J.C.'s conditions than the Evaluation Report.

The Hearing Officer's principal ground for discounting the independent report was its finding of a specific learning disability as to mathematics, but the District Court was

7

correct that J.C.'s performance in math was anything but strong. In ninth grade, for instance, J.C. failed the first three periods of his basic algebra course, only passing the entire course (with a D grade) due to a strong final period. App. at 69. Arguably this pattern—strong performance for many years followed by a sharp decline—indicates a "discrepancy between intellectual ability and academic achievement." *See* 22 Pa. Code § 14.125. Cumberland cites no evidence for its claim that a specific learning disability could not manifest progressively over time, aside from a conclusory citation to the definition of specific learning disabilities as "a disorder in one or more of the basic psychological processes involved" in various tasks. There is nothing illogical about the idea that a learning disability might only impair a student's ability to do the tasks involved in higher and more complex forms of mathematics.

Even aside from this specific dispute, the Hearing Officer was wrong to characterize the independent report as "conclusory;" it is plainly more detailed in its analysis than the school's own Evaluation Report, showing J.C.'s life and the misery his disease inflicts on him in far richer context. *Compare* App. at 151–152, 188–189. Perhaps if the Hearing Officer's factual conclusions were entitled to increased deference, such as clear error review, the District Court's reversal as to the weight of the independent evaluation would be more of a problem. But the "modified *de novo*" standard does not actually restrict the Court's power to reach its own conclusions as to eligibility based on the preponderance of the evidence. This merely requires it to explain its disagreements with the Hearing Officer, which it did.

8

Cumberland also misstates that the school's Report concluded that J.C. was not IDEA eligible because of the second criterion, the need for specially designed instruction. In fact the Report checked the box indicating that J.C. does not have a qualifying disability at all. App. at 152. The Hearing Officer concluded to the contrary that Crohn's disease was a qualifying disability, and Cumberland does not argue otherwise. Nor is Cumberland correct in stating that the East Pennsboro IEP is "actually just an accommodations plan, but contained on an IEP form instead of on a Section 504 form." Appellant's Br. at 18. Although the IEP does include many of the same accommodations as the Cumberland Section 504 plan, and states that J.C. must participate in the general education curriculum for all classes, it also concludes that he requires itinerant learning/emotional support and "specially designed instructional strategies within his mainstream courses of study." App. at 262. And while Cumberland argues that there had not been sufficient time to see whether the newly enacted Section 504 plan and its accommodation of homebound instruction would be sufficient to address J.C.'s needs, it was already apparent that homebound instruction was, to put it mildly, not going well.

Ultimately the basis for Cumberland's conviction that J.C. does not require specially designed instruction is not the Evaluation Report but rather a disbelief that "a disease of the digestive system required adapting the content, methodology, or delivery of the academic curriculum." Appellant's Br. at 17. But the independent evaluation explains the connection well: J.C.'s life has been pervasively shaped in all facets by his disease, and his numerous behavioral, emotional, social, and academic problems are, to some degree, related to it. App. at 188. It may even, as the Evaluation Report itself

9

suggested, App. at 124, contribute to his ADHD—something neither the Report nor the Hearing Officer considered in their analysis of J.C.'s IDEA eligibility. In seeing Crohn's as something requiring only a Section 504 accommodation, not IDEA special education, Cumberland and the Hearing Officer both treated the disease as something discrete and isolated rather than the defining condition of J.C.'s life. The District Court did not err in finding to the contrary.

Finally, Cumberland claims the District Court erred in finding that the school breached its so-called "Child Find" duty. This refers to a school's obligation, under relevant federal law, to identify students with disabilities who require accommodations or special education services proactively rather than waiting around for a child's parents to confront them with evidence of this need. Both the IDEA and Section 504 impose such a duty, *see* 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 104.32. And there appears to be some confusion in this case about which "Child Find" duty is actually at issue. The Hearing Officer's decision made no finding as to Child Find under the IDEA because he concluded that J.C. was not IDEA-eligible, and then ruled that Cumberland had not violated Section 504 by failing to provide accommodations earlier. This analysis did not discuss the 504 Child Find obligation, and reasoned principally that the school had no notice that J.C. required accommodations prior to receiving the physician's notes in 2014. The District Court, meanwhile, found a violation of the Child Find duty under the IDEA; it also found that Cumberland should have provided Section 504 services well before when it started providing those services, but did not discuss the 504 claims in terms of a

10

Child Find duty. On appeal, however, both parties' briefs discuss the Child Find issue as though it were a Section 504 question.

Because both the IDEA Child Find and the Section 504 claims involve what Cumberland knew or should have known at what point in time, we will analyze them together. Cumberland knew of J.C.'s diagnosis as early as 2007. This seems sufficient to trigger its Section 504 obligations to ensure that J.C. received whatever accommodations he might require for his Crohn's disease, as no one disputes that Crohn's is sufficient to trigger Section 504 coverage. Although it appears Cumberland was willing to make *ad hoc* accommodations to J.C.'s needs due to Crohn's, *see* App. at 22, this was entirely reactive. It would be bad enough had J.C.'s performance in school been exemplary. But from seventh grade on he experienced severe academic decline and numerous disciplinary issues. The District Court is correct that Cumberland at least should have investigated the question of whether J.C.'s numerous issues stemmed from his debilitating, life-threatening disease in a way that would be helped by accommodations. It did not do so. The same applies under the IDEA, given that J.C. is IDEA-eligible and that among the warning signs was his declining academic performance.

Cumberland contends that the Hearing Officer correctly rejected the Section 504 claim because J.C. and his parents failed to prove that the "warning signs" they cite were caused by Crohn's. Appellant's Br. at 26–27. There are two problems here. First, the discussion they cite in the Hearing Officer's decision was not about Section 504 or the Child Find obligation at all; instead it concerned whether J.C.'s Crohn's disease qualified him for special education under the IDEA. In that context the Hearing Officer held that

11

J.C. had not sufficiently proven that his absences from school were caused by Crohn's, such that he had not proven his disease adversely affected his education.

Second, Cumberland's argument is illogical and inconsistent with the basic concept of a Child Find obligation. The School knew that J.C. had Crohn's, and it observed the warning signs. There cannot have been a burden on J.C. or his parents to come forward, at that time, with evidence the disease was the cause of his problems; that would be placing the burden on J.C. and his family for identifying him as a student with a disability, precisely what the Child Find duty forbids. If there was no burden at that time, if the school was obliged to investigate J.C.'s needs under the IDEA and Section 504 even before he had proven that his poor conduct and performance were a result of his disease, there can be no requirement for that proof now during litigation. That obligation was in play even were his disease not behind his declining performance in school. The District Court did not err, therefore, in concluding that Cumberland violated its Child Find obligations under the IDEA and that it violated its obligations under Section 504 by failing to adopt a service plan for J.C. until March 2014.

\*   \*   \*   \*   \*

Thus we affirm.