**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3771
_____

K. E.; B. E., o/b/o T.E.,
Appellant

v.

NORTHERN HIGHLANDS REGIONAL BOARD OF EDUCATION
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-18-cv-12617)
Honorable Kevin McNulty, U.S. District Judge
_____

Argued September 16, 2020

Before: KRAUSE, RESTREPO, and BIBAS, *Circuit Judges*


(Opinion filed:  December 16, 2020)


Thomas J. O'Leary **[Argued]**
Zahire D. Estrella-Chambers
Walsh Pizzi O'Reilly & Falanga
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, NJ 07102
    *Counsel for Appellants*

James L. Plosia, Jr. **[Argued]**
Jonathan F. Cohen

Plosia Cohen
385 Route 24
Suite 3G
Chester, NJ 07930
    *Counsel for Appellee*

————————

OPINION[*]

————————

KRAUSE, *Circuit Judge*.

Having concluded that Northern Highlands Regional High School denied their son, T.E., a free appropriate public education (FAPE) and reasonable accommodations for his disabilities, K.E. and B.E. moved him to a private school and sought tuition reimbursement, claiming violations of the Individual with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1482, N.J. Admin. Code 6a:14,[1] and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. The administrative law judge (ALJ) denied their request, and the District Court affirmed. For the reasons set forth below, we will vacate and remand.

## A. Background

Throughout elementary and middle school, T.E. thrived academically and socially, requiring an individualized education program (IEP) only for speech therapy. Midway through eighth grade, however, he required surgery to remove a brain tumor, which caused

———————————————

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] We will not separately analyze the New Jersey special education rules, as the parties do not contend any differences between those rules and the IDEA affect this case.

his "personality and emotional state" to become "noticeably different." JA 4. After he returned to school in January 2016, he was increasingly bullied by classmates who stole his personal items and "ma[d]e fun of him," making clear they "did not like him." JA 5. Over the ensuing months, T.E. was diagnosed with anxiety and depression, and "the severity of the bullying increased." JA 6. In May, "a student picked up T.E. during recess and dropped him, causing him to hit his head on the pavement, which triggered a grand mal seizure," and in June, "one of T.E's classmates held a pencil upright on his chair as he sat down," which "punctured T.E.'s pants and underwear and pierced his anus, causing rectal bleeding." JA 6.

As the abuse escalated, the middle school provided him with one-on-one supervision. That supervision, however, did not prevent another student from tackling him during a field day. Concerned for T.E.'s education and safety the following year, as he would be entering Northern Highlands Regional High School with "the same children who had bullied him," JA 7, T.E.'s parents began discussions with Northern Highlands about appropriate accommodations. In connection with those discussions, Northern Highlands's Rehabilitation Act coordinator met with B.E. and presented a draft Section 504 Plan. B.E. acknowledged receipt of this plan by signing it on June 12 and checking off the lines indicating she received notice of the Section 504 meeting and of T.E.'s Section 504 eligibility and rights, but she declined to check the separate line indicating "agree[ment] with the Section 504 Plan as written." JA 7. Instead, she handwrote her own additional requests for accommodations on another page of the plan.

3

Some weeks later, the 504 Team sent T.E.'s parents a revised plan that did not incorporate B.E.'s additional requests and that proposed to accommodate T.E.'s disabilities and safety risks by having him "leave class five minutes early." JA 10. T.E.'s parents rejected this revised proposal "because it would have required [T.E.] to miss approximately 10% of his instructional time" and "further stigmatized him." JA 9, 10.

The parents unsuccessfully sought to meet with Northern Highlands's principal and special services director ahead of the new school year, but only the IEP team was amenable to further discussions. At a meeting on July 20, B.E. and the IEP team agreed that T.E. would be evaluated by Dr. Jane Healey "to understand his cognitive functioning after his brain surgery," JA 12, and before summer's end, the parents took T.E. to undergo numerous neuropsychology assessments.

As these discussions continued with no clear path to resolution and the start of the school year approaching, the parents informed Northern Highlands they were "investigating private-school placements," even recognizing that "the application process for September matriculation had [already] been completed at private schools." JA 11. One such option was Dwight-Englewood, which initially told the middle school principal that, given the late date, "there was no pathway to admission." JA 10. On July 15, however, Dwight-Englewood informed the parents it had an opening, but only if the parents signed the enrollment contract within 24 hours, which, according to the parents, they did "to secure a safe option for T.E." in case no resolution could be reached with Northern Highlands. JA 11. At their subsequent meeting with the IEP Team, the parents did not mention they had signed this contract.

4

On September 6, with the new school year having started without any offer of placement under the IDEA or approved 504 Plan under the Rehabilitation Act, K.E. informed the Northern Highlands special services director that T.E. would matriculate instead at Dwight-Englewood. K.E. also requested, under the circumstances, that the parents and the school "meet as soon as practical to discuss the necessary process for reimbursement." JA 320. Again, however, the director declined, replying that the school would only "schedule a meeting with you" "once you send us the results of the neuropsych evaluation." *Id.*

A month into the school year, Dr. Healey completed her evaluation and report, which confirmed that T.E. suffered from anxiety and depression and included diagnoses of traumatic brain injury, seizure activity, ADHD, learning disorder, and coordination disorder. Her topline recommendations were that T.E. be educated in "a smaller and structured school environment" and that he work "with a learning specialist individually" on a regular basis. JA 337–38. Nonetheless, when Northern Highlands finally provided the parents with an offer of placement two days after it received the evaluation, the IEP "did not explicitly refer to Dr. Healey's neuropsychological report" and did not include the "majority of [the report's 22] recommendations." JA 18 & n.12. Nor did it "specifically detail the bullying incidents that had occurred" in eighth grade or acknowledge the report's conclusion that "a large public high school will not provide [T.E.] with the level of support he requires" for both "physical and emotional safety reasons." JA 17–18 & n.12. Instead, the IEP proposed the exact same safety accommodation as the previously rejected 504 Plan—that T.E. "[l]eave class 5 minutes early." JA 301.

T.E.'s parents rejected this offer of placement, continued T.E.'s enrollment at Dwight-Englewood, and eventually filed a due process petition seeking tuition reimbursement. That petition did not meet with success. According to the ALJ, who denied it, "both the Section 504 Accommodation Plan signed by B.E. on June 12, 2016, and the IEP offered . . . at the October 13, 2016, meeting offered FAPE." JA 70. Notably, however, the ALJ reached this conclusion without ever hearing testimony or argument on the subject of FAPE, let alone on the adequacy of the specific placement offered by Northern Highlands. Instead, in a series of procedural turnabouts, the ALJ first ruled that the parents failed to comply with the IDEA because they "did not provide timely written notice of their intention to place their son in an out of district school." JA 46. He next scheduled a second hearing, ostensibly to "determine if reimbursement should be full, reduced or denied." JA 47. He then limited that hearing to the effect of the parents' alleged failure to provide timely notice, whether the Rehabilitation Act claim was subsumed under the IDEA claim, and whether T.E. was entitled to compensatory education. And when he issued his decision, the ALJ did not address any of those issues and instead held that Northern Highlands provided FAPE.

On appeal, the District Court affirmed primarily on the ground that the parents were "not entitled to challenge the district's proposed IEP," JA 36, based on two circumstances in which the IDEA provides that tuition reimbursement "may be reduced or denied," 20 U.S.C. § 1412(a)(10)(C)(iii)—the parents' failure to provide the requisite notice and failure to behave reasonably. As the District Court interpreted the notice provision, it found dispositive that T.E.'s parents had "unilaterally placed T.E. at Dwight-Englewood without

6

providing the district ten days' notice of the placement." JA 36. And as to the reasonableness of the parents' conduct, although Northern Highlands and T.E.'s parents had *jointly* agreed on the expert and the school then declined to meet with the parents or provide an IEP until that expert finished her report, the District Court laid blame for the school's delay in proposing an IEP on "the time required for the *parents'* expert to complete her evaluation and report." JA 35. It also characterized the parents' "ongoing discussions with the district" after signing the Dwight-Englewood enrollment contract as "mask[ing] a *fait accompli*," JA 35, and took note of the ALJ's adverse credibility findings.

As to FAPE, which was the basis on which the ALJ had denied reimbursement, the District Court noted that Dr. Healey had provided "twenty-two recommendations that spanned more than three pages" and that she concluded "that '[T.E.] becomes easily overwhelmed and requires a smaller and structured school environment. Because of physical and emotional safety reasons, a large public high school will not provide [T.E.] with the level of support he requires.'" JA 18 n.12 (citation omitted). The District Court also observed that, notwithstanding these recommendations and conclusions, "[t]he majority of [Dr. Healey's] recommendations were not included in the final IEP," *id.*, and that "Northern Highlands did not provide the reasons it used as a basis for disagreeing [with] the request that T.E. be educated at Dwight-Englewood," JA 18 n.13. Nonetheless, although it engaged in no independent factfinding, the District Court summarily concluded at the end of its opinion that "[t]he ALJ determined that both the 504 Plan and the IEP provided T.E. with a FAPE" and "[t]he record now before the Court supports that conclusion." JA 42.

Thus, on the alternative bases of the IDEA's limitation provisions and the offer of FAPE, the District Court granted Northern Highlands's motion for summary judgment. The parents now appeal.

**B.      Standard of Review**

A district court's summary judgment ruling on an IDEA claim is effectively a ruling on the administrative record. *See Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 264 (3d Cir. 2012). In reviewing that ruling, we consider *de novo* "whether the District Court applied the correct legal standards," and we review factual findings for clear error. *Id.* at 268 (citation omitted).

For its part, a district court applies a modified *de novo* standard to the ALJ's decision: It reviews legal conclusions *de novo* and gives the ALJ's factual findings "due weight" by treating them as prima facie correct, but the district court ultimately must make its own factual findings by a preponderance of the evidence. *Id.* (citation omitted). Where the ALJ has determined that the "testimony of one witness" is "contradictory [and that the] testimony of another witness" is "more worthy of belief," the district court gives that credibility determination "special weight" and reviews it for clear error. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004).

**C. Discussion**[2]

Here, the District Court issued a detailed and thoughtful opinion that denied the parents' IDEA and Rehabilitation Act claims but that was necessarily premised, in significant part, on findings and conclusions reached by the ALJ. T.E.'s parents argue those findings and conclusions were erroneous, resulting in an erroneous denial of reimbursement by the District Court. We do not opine on whether reimbursement ultimately should be reduced or denied, but we agree that, in light of certain procedural irregularities and erroneous factfinding in the ALJ proceedings and the consequences for the District Court's application of 20 U.S.C. § 1412(a)(10)(C)(iii), we cannot be confident the Court denied reimbursement on a proper basis and thus will remand.

Three concerns animate our conclusion that remand is appropriate. First, it is not clear if the District Court treated the IDEA's limitations provisions as discretionary bases for reduction or denial of reimbursement, rather than statutory bars to any recovery. Second, the District Court's alternative basis for affirming, the provision of FAPE, was not supported as required by a preponderance of the evidence. And third, the ALJ's and District Court's analyses of the Rehabilitation Act claim rest on a clearly erroneous finding of fact. We discuss each point below.

1. The IDEA's Equitable Limitations on Tuition Reimbursement

As a baseline matter, 20 U.S.C. § 1412(a)(10)(C) provides that, although private school tuition reimbursement is not generally required when parents enroll their child in

[2] The District Court had jurisdiction under 20 U.S.C. § 1415(i)(2) and supplemental jurisdiction under 28 U.S.C. § 1367, and we have jurisdiction under 28 U.S.C. § 1291.

private school without the public agency's consent or referral, "a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if [it] finds that the agency had not made a [FAPE] available to the child in a timely manner prior to that enrollment." 20 U.S.C. § 1412(a)(10)(C)(ii). That reimbursement, however, "may be reduced or denied" on the basis of two equitable limitations: (1) if the parents did not give notice that they were rejecting the proposed placement and intending to enroll the child in private school at public expense at least ten days "prior to the removal of the child from the public school"; or (2) if there is "a judicial finding of unreasonableness with respect to actions taken by the parents." *Id.* § 1412(a)(10)(C)(iii).

While we agree with the District Court the reimbursement claim here is subject to these limitations provisions,[3] we cannot ascertain if the Court applied them properly.

First, the District Court appears to have treated these equitable limitations as statutory bars on any reimbursement, rather than as discretionary bases for reducing or denying reimbursement. *See Forest Grove*, 557 U.S. at 247 (holding these provisions give courts "discretion to reduce the amount of a reimbursement award if the equities so

---

[3] The parents contend the notice provision does not apply to them because it requires T.E. to have "previously received special education and related services," but his speech therapy counts only as a related service. Appellant Br. 18 (quoting 20 U.S.C. § 1412(a)(10)(C)(ii)) (emphasis omitted). Their argument misunderstands that "related services," which "assist a child with a disability to benefit from special education," 20 U.S.C. § 1401(26)(A), are part and parcel of special education and do not exist apart from that "specially designed instruction," *id.* § 1401(29). In any case, the Supreme Court has held the "IDEA authorizes reimbursement . . . when a school district fails to provide a FAPE . . . , regardless of whether the child previously received special education or related services," *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009), so it is the parents' entitlement to reimbursement—not the child's prior receipt of special education—that puts the notice provision in play.

10

warrant"). That is, while the statute speaks in permissive terms—that reimbursement "may be reduced or denied," 20 U.S.C. § 1412(a)(10)(C)(iii)—the District Court stated that the parents were "not entitled to challenge the district's proposed IEP" as a result of their failure to comply with those provisions, JA 36. Our concern here is reinforced by the fact that the District Court, while conducting a detailed analysis in many other respects, did not acknowledge or address the possibility of a reduction in reimbursement, in lieu of outright denial. *See Forest Grove*, 557 U.S. at 247.

Second, both the ALJ and the District Court appear to have faulted the parents for failing to "provid[e] the district ten days' notice of the placement" at Dwight-Englewood. JA 36. The statute, however, requires ten days' notice of the parents' "reject[ion of] the placement proposed by the public agency to provide a [FAPE] to their child, including . . . their intent to enroll their child in a private school at public expense." 20 U.S.C. § 1412(a)(10)(C)(iii). That is a distinction with a difference because notice of rejection of the placement proposed by the public agency presupposes that the public agency has, in fact, proposed a placement. Northern Highlands, however, did not propose a placement until a month after school had commenced. And in that circumstance, a different subsection of the IDEA comes into play: Pursuant to § 1412(a)(10)(C)(iv), the cost of reimbursement "shall not be reduced or denied for failure to provide such notice if," among other things, (a) "the school prevented the parent from providing such notice"; or

11

(b) compliance "would likely result in physical harm to the child."[4]  It is not apparent that the District Court considered whether these provisions were applicable, and to the extent it viewed Northern Highlands's delay in offering a placement as "largely if not solely attributable to the time required for the *parents'* expert to complete her evaluation and report," JA 35, it may not have appreciated that the Northern Highlands IEP team agreed to engage and also paid for Dr. Healey to perform an evaluation before it offered an IEP, knowing that such evaluations "usually [take] 90 days" to complete, JA 446, and that the school bears the ultimate responsibility to provide T.E. with a FAPE at or before the commencement of the school year, *see* 20 U.S.C. § 1414(d)(2)(A).  It is also not apparent whether the District Court considered, in light of T.E.'s history of being bullied and assaulted by "the same children who had bullied him," JA 7, if matriculating him at Northern Highlands in the initial weeks of the school year in the absence of an IEP "would likely result in physical harm," 20 U.S.C. § 1412(a)(10)(C)(iv)(I)(cc), or "serious emotional harm," *id.* § 1412(a)(10)(C)(iv)(II)(bb), to him.

Third, it is not clear that the District Court's analysis of reasonableness entirely comports with our case law.  We have treated "a judicial finding of unreasonableness with

---

[4]  Section 1412(a)(10)(C)(iv) also precludes reduction or denial of reimbursement if the parents were not provided notice of the notice requirement itself.  While the parents raised the argument before the District Court and this Court that they did not receive a copy of the IDEA procedural safeguards in 2016, the ALJ and District Court found that the parents were aware of their right to request reimbursement based on prior years' copies with which they had been provided.  We likewise find this carveout from reimbursement to be inapplicable where the IDEA requires "a copy also shall be given to the parents . . . upon initial referral or parental request for evaluation," 20 U.S.C. § 1415(d)(1)(A), as T.E.'s parents did on June 28.

12

respect to actions taken by the parents," *id.* § 1412(a)(10)(C)(iii)(III), as an equitable limitation on reimbursement where the parents' own delays and obstructions of the IEP process "substantially precluded any possibility that the District could timely develop an appropriate IEP" such that the district was "not first given . . . a good faith opportunity to meet its obligations," *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 71–72 (3d Cir. 2010).

The judicial finding of unreasonableness here rested, in part, on the District Court's observation, based on the ALJ's findings, that the parents "categorically refus[ed] to place T.E. at Northern Highlands" at the October 2016 IEP meeting. JA 35. Specifically, the District Court noted that "they waited until the October 2016 meeting to reject the IEP in its entirety, informing the [IEP Team] that they did not intend to withdraw T.E. from Dwight-Englewood." *Id.* It is difficult to view those facts as proof the parents "precluded . . . the District [from] timely develop[ing] an appropriate IEP," *C.H.*, 606 F.3d at 71, however, given that no draft IEP had been offered to the parents before that meeting, and the parents' attempts to arrange earlier meetings with Northern Highlands's special services director apparently were "rebuffed." JA 24 n.15.

It may well be, as the District Court found, that "after early July, K.E. and B.E. never truly intended to place T.E. at Northern Highlands." JA 35. Still, the reasonableness inquiry focuses not on the parents' subjective intent, but on their actual conduct and its consequences for the timely completion of the evaluation and IEP. *See C.H.*, 606 F.3d at 71; *cf. C.G. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 288 (1st Cir. 2008) (finding unreasonableness where "the parents' actions disrupted the IEP process, stalling its consummation and preventing the development of a final IEP"); *Rockwall Indep. Sch. Dist.*

*v. M.C.*, 816 F.3d 329, 340 (5th Cir. 2016) (finding unreasonableness where the parents "explicitly refused to attend any subsequent meetings" midway through the IEP process and their communications "reflect[ed] their complete unwillingness to cooperate"). And for that actual conduct to be considered reasonable, parents need not prefer the public school or enroll their child there when they have a reasonable basis to believe the placement being offered is inadequate or unsafe—or, as here, where no IEP has been prepared.

Instead, the Supreme Court has recognized that "parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement." *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370 (1985). And where—as here—the parents opt for the latter, a court's denial of reimbursement on the ground that they were "intractable" for "refusing to allow Northern Highlands to implement [the IEP]," JA 35—*i.e.*, for refusing to enroll their child in a school they believe unsafe and requiring them to "go along with the IEP" they believe "to be inappropriate," *Burlington*, 471 U.S. at 370—would result in the very kind of "empty victory" the Supreme Court rejected: a decision informing the parents years after the fact "that they were right but that these expenditures could not in a proper case be reimbursed by the school officials," *id.*

Other considerations beyond the scope of the reasonableness inquiry may also have factored into the District Court's IDEA analysis. The draft 504 Plan—which, as explained below, was never approved by the parents—relates to their Rehabilitation Act claim, so the relevance of whether the school was "prevented from [implementing B.E.'s handwritten

14

requests] by the parents' refusal to enroll T.E. at Northern Highlands," JA 35, is of questionable relevance. In any case, the revised 504 Plan Northern Highlands proposed did not incorporate her suggestions.[5]  Additionally, any failure on the parents' part to provide the notice specified in the IDEA is an equitable limitation wholly separate from reasonableness under § 1412(a)(10)(C)(iii), not "an initial hurdle to their claim to have behaved reasonably." JA 33.

It is not clear if the District Court's unreasonableness finding rested in part on the ALJ's criticism of the parents' tone and demeanor at the hearing. The ALJ made adverse credibility findings, observing that the parents were being "argumentative," "evasive," "condescending," and "spun [] answers to conform to [their] theme, which was [Northern Highlands] did not offer sufficient assurances that T.E. would be safe."[6] JA 66–67. The

---

[5] The District Court's belief that the revised 504 Plan incorporated B.E.'s suggestions seems to have stemmed from the finding that the school's offer to "adjust T.E.'s schedule to keep him with friends and away from his aggressors," JA 40, would be responsive to B.E.'s safety concerns and obviate any need to commit to her suggestions, which the Court dismissed as "vague, conditioned upon T.E.'s presence at school, or both," JA 39–40.

[6] Although district courts must accept an ALJ's determination that "the testimony of one witness [is] more worthy of belief *than the contradictory testimony of another witness*" absent "non-testimonial, extrinsic evidence in the record [that] would justify a contrary conclusion," *Shore Reg'l*, 381 F.3d at 199 (citation omitted) (emphasis added), the ALJ's credibility determination here does not appear to have involved the weighing of contradictory testimony. We note, too, that a number of the parents' answers that arguably fit the ALJ's description of "argumentative," "evasive," and "condescending," were in response to questioning by Northern Highlands's attorney that fits that description just as well and went unchecked by the ALJ. *See, e.g.*, JA 541–44, 560–62, 707–11, 724–26. Should the District Court decide to conduct a hearing on remand, it will have its own opportunity to make credibility determinations in any event, but as a general

15

proper focus of the reasonableness inquiry, however, is not the parents' conduct in the course of litigation, but their conduct in the course of IEP discussions, *i.e.*, "in relation to the fashioning of a FAPE," JA 33.

Remand is thus appropriate for the District Court to address these considerations and to apply the equitable limitations consistent with the IDEA and our case law.

### 2. The Provision of a FAPE

Although the District Court suggested the provision of FAPE might also provide a basis to deny reimbursement, it correctly identified the significant deficits in the ALJ's analysis and the inadequacy of the resulting record, which the parties agreed to proceed on without additional discovery in the District Court. Because we share the Court's concerns, we cannot affirm on that alternative ground.

What record there is in this case reflects a series of fits and starts before the ALJ, who first ruled on the issue of notice, then called for a hearing on whether reimbursement should be "full, reduced or denied," JA 47,[7] then further restricted the subject of that

---

matter, these exchanges highlight the importance of a judge's enforcement of civility in her courtroom, and the downward spiral that can occur in its absence.

[7] While the provision of FAPE and the IDEA's equitable limitations are alternative statutory bases on which reimbursement may be denied, the determination of "whether the IEP afforded the student a FAPE," which relates to eligibility for reimbursement, appears logically antecedent to the determination of entitlement based on "whether the parents took appropriate actions." *Shore Reg'l*, 381 F.3d at 198–99. The ALJ flipped these inquiries, treating the parents' compliance with the notice provision as an eligibility requirement, but the IDEA places the onus on covered schools to "ma[k]e a [FAPE] available to the child in a timely manner prior to [his] enrollment" in private school. 20 U.S.C. § 1412(a)(10)(C)(ii). If the public school has done so, then it enjoys a "safe harbor" from IDEA liability, *Forest Grove*, 557 U.S. at 241, and there would be no live question whether, as an equitable matter, reimbursement should be "full, reduced or denied," JA 47.

hearing, and then switched gears again by ruling on the entirely different issue of FAPE. Yet, as the District Court astutely observed, the factual foundation for a ruling on FAPE was lacking: for unexplained reasons, the "majority of [Dr. Healey's] recommendations were not included in the final IEP," and "Northern Highlands also did not explain the bases for its disagreement with Dr. Healey's opinion that 'a large public high school cannot provide [T.E.] with the level of support he requires.'" JA 18–19 n.12–13 (second alteration in original).

In short, the record, as such, is inadequate for meaningful appellate review of the private and public placements at issue under the applicable standards for a FAPE. Remand is therefore necessary for the District Court to develop that record to the extent necessary to ensure any finding of FAPE is supported by a preponderance of the evidence. *See Ridley*, 680 F.3d at 268–69; *see also Bedrosian v. United States of Am., Dep't of the Treasury, IRS*, 912 F.3d 144, 153 (3d Cir. 2018) (explaining we cannot review factual findings where "we are not sure the District Court made [them] based on . . . the correct legal standard").

3. Rehabilitation Act Claim

Finally, we turn to the District Court's denial of the parents' Rehabilitation Act claim. Like the ALJ, the District Court rejected this claim because it found that "[t]he administrative record leaves little doubt that the parents accepted the district's 504 Plan." JA 39. We cannot agree that the record supports that finding.

The proposed plan itself, as confirmed by B.E.'s testimony, reflects that B.E. signed and checked only the lines for "I received a written notice of my rights and procedural safeguards under Section 504" and "I received notice of the Section 504 eligibility and

17

accommodations plan meeting," and she did not check "I agree with the Section 504 plan as written." JA 358. Her unrebutted testimony confirms what is made plain by the missing check mark, the additional requests for accommodations that she handwrote on that version of the 504 Plan, and the fact Northern Highlands proceeded to offer a revised 504 Plan. That is, T.E.'s parents *did not* accept the 504 Plan.

On this record, we are "left with a definite and firm conviction that a mistake has been committed." *Shore Reg'l*, 381 F.3d at 199 (citation omitted). The District Court's finding that the parents accepted the 504 Plan on June 12 is clearly erroneous and does not provide an independent basis to reject the Rehabilitation Act claim. The District Court also dismissed the Section 504 claim on the basis that "in any event, the [504] plan did not discriminate against T.E.," JA 39, but pointed to little evidence or law to support that finding. On remand, then, the District Court will have the opportunity to address whether the 504 Plan offered reasonable accommodations, as well as whether the IEP offered FAPE for purposes of the IDEA and state law claims.

## D.    Conclusion

For the foregoing reasons, we will vacate the District Court's judgment and remand for proceedings consistent with this opinion.